# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| SLYDE ANALYTICS LLC, | |
| Plaintiff, | |
| v. | Civil Action No. 2:24-cv-331-RWS-RSP |
| APPLE INC., | **JURY TRIAL DEMANDED** |
| Defendant. | **ORAL ARGUMENT REQUESTED** |

**DEFENDANT APPLE INC.'S MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(3) OR, ALTERNATIVELY, TO TRANSFER TO THE NORTHERN DISTRICT OF CALIFORNIA, AND TO DISMISS COUNTS V-XI PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)**

# TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................................1

II.   STATEMENT OF ISSUES ....................................................................................2

III.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY .....................2

    A.    The Parties ..................................................................................................2

    B.    The Complaint ............................................................................................3

        1.    Asserted Patents ..............................................................................3

        2.    Venue Allegations ...........................................................................4

IV.   LEGAL STANDARD .............................................................................................5

V.    ARGUMENT ..........................................................................................................6

    A.    The Complaint Should Be Dismissed In Its Entirety For Improper Venue. ...........6

        1.    Slyde Has Not Pleaded Facts Showing Any Regular And Established Place Of Business "Of The Defendant" In This District. ..........................................................................................7

            a.    Apple does not own or lease any space in Best Buy's stores, or otherwise exercise possession or control over Best Buy's stores. ...............................................................8

            b.    Apple does not require its employees to live in the District or to store materials to be distributed or sold within the District. ..........................................................................12

            c.    Apple does not hold out Best Buy's stores as places of business of Apple. ............................................................13

            d.    Apple's places of business in other venues differ significantly from Best Buy's stores. ..............................15

        2.    If Not Dismissed Outright, The Court Should Transfer This Case To The Northern District Of California. ..................................15

    B.    Counts V-XI Should Be Dismissed Because The Asserted Patents Claim Patent-Ineligible Abstract Ideas Without Any Inventive Concept. ......................17

        1.    The Claims Of The Asserted Patents Are Directed To An Abstract Idea. ..........................................................................18

        a.     The claims recite the abstract idea of collecting, analyzing, and displaying information. ...........................................................18

        b.     The asserted patents claim no improvement in computer technology. .....................................................................................25

     2.    There Is No Inventive Concept That Transforms The Claimed Abstract Idea Into A Patent Eligible Application. ....................................26

VI.    CONCLUSION .............................................................................................30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*4WEB, Inc. v. NuVasive, Inc.*,
  No. 23-cv-192-JRG, 2024 WL 1932416 (E.D. Tex. May 2, 2024) ............................10, 12

*AGIS Software Development LLC v. Google LLC*,
  No. 19-cv-361-JRG, 2022 WL 1511757 (E.D. Tex. May 12, 2022) ................................14

*AlexSam, Inc. v. Simon Prop. Grp. (Texas), L.P.*,
  No. 19-cv-331-JRG, 2021 WL 9816147 (E.D. Tex. Aug. 19, 2021) ................................6

*Alice Corp. v. CLS Bank Int'l*,
  573 U.S. 208 (2014)....................................................................................17, 26, 29

*AptusTech LLC v. Trimfoot Co.*,
  No. 19-cv-133-ALM, 2020 WL 1190070 (E.D. Tex. Mar. 12, 2020) ........................13, 14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)....................................................................................................6

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018)..................................................................................19

*Beteiro, LLC v. DraftKings Inc.*,
  104 F.4th 1350 (Fed. Cir. 2024) ................................................................................26

*CardioNet LLC v. InfoBionic, Inc.*,
  Nos. 20-2123, -2150, 2021 WL 5024388 (Fed. Cir. Oct. 29, 2021)................................23

*CardioNet, LLC v. InfoBionic, Inc.*,
  816 F. App'x 471 (Fed. Cir. 2020) .............................................................................18

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
  776 F.3d 1343 (Fed. Cir. 2014)..................................................................................23

*Dropbox, Inc. v. Synchronoss Techs., Inc.*,
  815 F. App'x 529 (Fed. Cir. 2020) .............................................................................25

*Electric Power Grp., LLC v. Alstrom S.A.*,
  830 F.3d 1350 (Fed. Cir. 2016)........................................................17, 18, 20, 23, 25, 26

*EMED Techs. Corp. v. Repro-Med Sys., Inc.*,
  No. 17-cv-728-WCB-RSP, 2018 WL 2544564 (E.D. Tex. June 4, 2018)....................7, 16

*Fitbit Inc. v. AliphCom*,
  No. 16-cv-118-BLF, 2017 WL 819235 (N.D. Cal. Mar. 2, 2017)....................................18

*Fractus, S.A. v. ZTE Corp.*,
  No. 17-cv-561-JRG, 2018 WL 11363369 (E.D. Tex. Sept. 28, 2018) ............................11

*In re Apple Inc.*,
  No. 21-181, 2021 WL 5291804 (Fed. Cir. Nov. 15, 2021) ...............................................17

*In re Cray Inc.*,
  871 F.3d 1355 (Fed. Cir. 2017)..............................................7, 8, 10, 12, 13, 15

*In re Google LLC*,
  949 F.3d 1338 (Fed. Cir. 2020)................................................................7, 10

*In re Volkswagen Grp. of Am., Inc.*,
  28 F.4th 1203 (Fed. Cir. 2022) .........................................................................15

*In re ZTE (USA) Inc.*,
  890 F.3d 1008 (Fed. Cir. 2018)...........................................................................7

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
  850 F.3d 1332 (Fed. Cir. 2017).............................................21, 25, 28, 29, 30

*Intellectual Ventures I LLC v. Symantec Corp.*,
  838 F.3d 1307 (Fed. Cir. 2016)...............................................22, 26, 29

*International Bus. Machs. Corp. v. Zillow Grp., Inc.*,
  50 F.4th 1371 (Fed. Cir. 2022) .........................................................................23

*International Techs. & Sys. Corp. v. Samsung Elecs. Co.*,
  No. 17-cv-1748-DOC, 2018 WL 4963129 (C.D. Cal. June 22, 2018) .........................8, 14

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
  566 U.S. 66 (2012).....................................................................................19, 27

*PersonalWeb Techs. LLC v. Google LLC*,
  8 F.4th 1310 (Fed. Cir. 2021) ...........................................................................22

*Philips N. Am. LLC v. Fitbit LLC*,
  626 F. Supp. 3d 292 (D. Mass. 2022) ...............................................................18

*RecogniCorp, LLC v. Nintendo Co.*,
  855 F.3d 1322 (Fed. Cir. 2017).........................................................................26

*SAP Am., Inc. v. InvestPic, LLC*,
  898 F.3d 1161 (Fed. Cir. 2018)............................................18, 19, 24, 27, 28

*Semantic Search Techs. LLC v. Aldo U.S., Inc.*,
  425 F. Supp. 3d 758 (E.D. Tex. 2019) ...........................................................6, 17

iv

*Seville v. Maersk Line, Ltd.*,
    53 F.4th 890 (5th Cir. 2022) ...........................................................................16

*TC Heartland LLC v. Kraft Foods Grp. Brands LLC*,
    581 U.S. 258 (2017).........................................................................................6

*Tiare Tech., Inc. v. Dine Brands Glob., Inc.*,
    No. 22-cv-490-JRG-RSP, 2024 WL 607407 (E.D. Tex. Jan. 4, 2024)............................5

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017)......................................................................30

*Uniloc USA, Inc. v. Nutanix, Inc.*,
    No. 17-cv-174-JRG, 2017 WL 11527109 (E.D. Tex. Dec. 6, 2017) ................................12

*Weisner v. Google LLC*,
    51 F.4th 1073 (Fed. Cir. 2022) ......................................................................29

*Westech Aerosol Corp. v. 3M Co.*,
    927 F.3d 1378 (Fed. Cir. 2019)......................................................................16

**Statutes**

28 U.S.C. § 1400(b) ...............................................................................................6

28 U.S.C. § 1406(a) ..............................................................................................15

## I.    INTRODUCTION

This case should be dismissed in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(3) and 28 U.S.C. § 1406(a) because venue is not proper in the Eastern District of Texas. Apple neither resides nor maintains a regular and established place of business in the District as required for venue under 28 U.S.C. § 1400(b).  Apple has no offices or stores in the District, and no plaintiff suing Apple for patent infringement has established proper venue in the Eastern District of Texas since 2019 when Apple last had a place of business in the District.

The only venue allegations in the complaint relate to third-party retailer Best Buy, which—unlike Apple—has stores in the Eastern District of Texas.  But Best Buy's stores are places of business of Best Buy, not Apple.  It is well established that the presence of third-party retailers does not make venue proper as to a supplier like Apple that does not have its own place of business in the District.  Apple does not own or lease any space within Best Buy's stores, or otherwise exercise possession or control over Best Buy's stores.  In fact, Best Buy can close locations without consulting Apple—and it has.  Apple does not own any merchandise or fixtures within Best Buy's stores, and Best Buy sets the price for all Apple merchandise that it sells.  Apple does not advertise Best Buy's stores as places of business of Apple.  And while Apple has a handful employees who work within Best Buy's stores in the District, that does not convert Best Buy's stores into places of business of Apple.  Those Apple employees do not complete any sales transactions or even have access to locked inventory within Best Buy's stores.  Given Slyde's deficient venue allegations, the proper remedy is dismissal.  However, at a minimum, the case should be transferred under 28 U.S.C. § 1406(a) to the Northern District of California, which is a judicial district in which this case could have been brought.

The Court need not go further than finding improper venue to resolve this motion.  But the allegations in Counts V-XI fail for the further reason that the patents at issue are invalid under 35

U.S.C. § 101. The seven patents asserted in those counts merely claim the abstract idea of collecting, analyzing, and displaying information in fitness devices. The claims recite no technological improvement; on the contrary, the claimed technology is entirely generic and conventional (*e.g.*, an "accelerometer" that provides "acceleration data"; a "digital processor" that is "configured to calculate" values). At most, the claims purport to automate processes that humans have long performed in their minds—such as estimating race finish times based on an athlete's pacing—which is a telltale sign that they claim an abstract idea. There is no inventive concept underlying these claims that amounts to anything more than the abstract idea itself. To the extent that the claims say anything at all about how the claimed invention is implemented, they merely recite mathematical formulas that only reinforce their abstract nature. Because Slyde cannot state a claim for these patents claiming abstract ideas without any inventive concept, the Court should dismiss Counts V-XI under Federal Rule of Civil Procedure 12(b)(6).

## II.     STATEMENT OF ISSUES

1.     Whether the Court should dismiss this case under Federal Rule of Civil Procedure 12(b)(3) and 28 U.S.C. § 1406(a)—or, alternatively, transfer it to the Northern District of California—because Slyde has not established that venue is proper in the Eastern District of Texas under 28 U.S.C. § 1400(b).

2.     If not dismissed for improper venue or transferred, whether the Court should dismiss Counts V-XI under Federal Rule of Civil Procedure 12(b)(6) because the claims of those patents are invalid under 35 U.S.C. § 101.

## III.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.     The Parties

Defendant Apple is a California corporation. Dkt. 1, ¶ 2. Apple designs, manufactures, and sells a wide range of consumer products, including the iPhone and Apple Watch that are

accused of infringement in this litigation.  Apple sells its products through its website, directly to consumers in Apple Stores, and through third-party retailers and distributers.  Apple has not had any Apple Stores in the Eastern District of Texas since 2019.  Dockendorf Decl. ¶ 14.

According to the complaint, Plaintiff Slyde Analytics LLC is a Texas limited liability company with a principal place of business at the same address in Marshall, Texas as its counsel at McKool Smith.  Dkt. 1, ¶ 1.  Public records indicate that Slyde was formed on October 10, 2022.  Ex. 1 at 1.[1]  Just four and half months later, Slyde filed its first lawsuit in this District.  *See Slyde Analytics LLC v. Samsung Elecs. Co.*, No. 23-cv-83-RWS-RSP (E.D. Tex.) (filed Feb. 28, 2023).  Slyde's certificate of formation identifies Ascend Innovation Management, LLC as the company's sole managing member.  Ex. 1 at 1.  According to public records, Ascend Innovation Management, LLC was incorporated in the State of Washington on July 14, 2022.  Ex. 4 at 1.  Ascend Innovation Management identifies its "Nature of Business" as "Innovation Management, Investment, Consulting and Monetization."  *Id.* at 2.  Slyde does not appear to have any products or engage in any business outside of filing lawsuits for patent infringement.

### B.    The Complaint

#### 1.    Asserted Patents

On May 6, 2024, Slyde sued Apple for infringement of eleven patents, which relate to user interfaces for electronic watches, switching power modes in electronic watches, and devices for analyzing health and fitness metrics.  *See* Dkt. 1, ¶¶ 8-18.  Slyde had no apparent involvement in the development of the inventions claimed in the patents-in-suit.  As indicated on their face, the patents-in-suit were originally assigned to one of three Swiss companies named Comme Le Temps SA, Myotest SA, and Slyde Watch SA.  *See* Dkt. 1-1 through 1-11.  According to the Patent

---

[1] "Ex. __" refers to the exhibits to the declaration of Andrew J. Danford filed with this motion.

Office's records, Slyde acquired the patents-in-suit through assignment agreements executed on December 28, 2022.  *See* Exs. 2-3.

### 2.     Venue Allegations

The complaint contains a total of three paragraphs of substantive venue allegations.  Dkt. 1, ¶¶ 2-4.  Those allegations identify no physical location within the Eastern District of Texas that is a regular and established place of business of Apple.  Instead, the complaint relies entirely on "Best Buy locations in this District where Apple products are sold directly to customers."  Dkt. 1, ¶ 2.  The complaint alleges that "certain Best Buy locations within this District contain Apple Shops," which Apple's website describes as "Apple-designed outlets located within select Apple resellers and other retail stores."  *Id.* ¶ 3.  However, as the complaint makes clear, these Apple Shops are part of Best Buy's stores, not any Apple location.  For example, the complaint quotes from Best Buy's website that Apple Shops are "[n]ow open at a Best Buy near you" and that the Apple Shop is "our [*i.e.*, Best Buy's] store-within-a store for all things Apple."  *Id.*  The complaint contains no allegations that Apple owns or leases any space within Best Buy's stores, or otherwise exercises ownership or control over Best Buy's stores.  Nor could it.  As explained below, Best Buy owns all fixtures and merchandise within its stores.  Dockendorf Decl. ¶ 8.  Apple has no role in managing inventory at Best Buy's stores.  Leslie Decl. ¶¶ 3-4.  And Best Buy can close its stores, including those with Apple Shops, without consulting Apple—as it has done dozens of times in the past three years.  Dockendorf Decl. ¶ 13.

The complaint further alleges that Apple's website states that "[m]any [Apple Shops] are staffed with Apple Solutions Consultants – trained Apple employees who can help you find the best solution."  Dkt. 1, ¶ 3.  However, the complaint contains no further allegations as to what these Apple employees do while in Best Buy's stores.  When present within Best Buy's stores, Apple's employees are there solely to engage with Best Buy's employees and customers to educate

them about Apple's products, advocate for Apple's brand, and help customers find the Apple product that best suits their needs. Calhoun Jemmings Decl. ¶ 7. Apple's employees do not have any role in the management or operation of Best Buy's stores. *Id.* ¶ 4. For example, Apple's employees do not complete any sales transactions, or have access to the store's cash registers, locked inventory, or Best Buy's computer systems for checking inventory. *Id.* ¶¶ 9-10. Apple's employees do not bring any Apple merchandise with them to sell when they are in Best Buy's stores. *Id.* ¶ 7. Even the demonstration models at Best Buy are owned by Best Buy. *Id.*

Finally, the complaint alleges that "certain Best Buy locations, including those located in this District, are 'Apple Authorized Service Providers,'" where Apple products can be repaired. Dkt. 1, ¶ 4. But the material cited in the complaint makes clear that those services are performed by Best Buy employees, called "Geek Squad Agents." *Id.* Indeed, the quoted advertising from Best Buy repeatedly seeks to reassure customers precisely because the repairs are performed at Best Buy instead of at an Apple location. *See, e.g.*, *id.* ("Our Geek Squad® Agents are Apple-trained, so you can trust us with all your Apple devices at any Best Buy store near you."). Similarly, Apple's website is clear that those services are performed by Best Buy and thus seeks to reassure customers of the quality of work performed by Best Buy employees. *Id.* ("[Y]ou get the same professionalism and quality of repair you'd expect from Apple.").

## IV.    LEGAL STANDARD

On a motion to dismiss for improper venue, "the burden of sustaining venue lies with the plaintiff." *Tiare Tech., Inc. v. Dine Brands Glob., Inc.*, No. 22-cv-490-JRG-RSP, 2024 WL 607407, at *3 (E.D. Tex. Jan. 4, 2024) (quotation omitted). "A plaintiff may carry its burden by presenting facts, taken as true, that establish venue." *Id.* "In determining whether venue is proper, the Court may look beyond the complaint to evidence submitted by the parties." *Id.* (quotation omitted). While the Court must accept well-pleaded allegations as true and resolve all conflicts in

favor of the plaintiff, the Court "need not credit conclusory allegations." *AlexSam, Inc. v. Simon Prop. Grp. (Texas), L.P.*, No. 19-cv-331-JRG, 2021 WL 9816147, at *1 (E.D. Tex. Aug. 19, 2021). "When unsubstantiated allegations are controverted by affidavit or declaration, the affidavit or declaration trumps the allegation." *Id.* (quotation omitted).

"Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a complaint that does not state a claim for relief that is 'plausible on its face.'" *Semantic Search Techs. LLC v. Aldo U.S., Inc.*, 425 F. Supp. 3d 758, 768 (E.D. Tex. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "At this stage, the Court accepts all well-pleaded facts as true and views those facts in the light most favorable to the plaintiffs." *Id.* at 769.

## V.    ARGUMENT

### A.    The Complaint Should Be Dismissed In Its Entirety For Improper Venue.

The "sole and exclusive provision controlling venue in patent infringement actions" is 28 U.S.C. § 1400(b). *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 581 U.S. 258, 266 (2017). Section 1400(b) is more restrictive than the general venue provisions of 28 U.S.C. § 1391(c) and limits venue in patent cases to "the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." 28 U.S.C. § 1400(b). Under § 1400(b), a defendant "resides" only in its state of incorporation. *TC Heartland*, 581 U.S. at 268. As Slyde acknowledges (Dkt. 1, ¶ 2), Apple is a California corporation and thus does not reside in the Eastern District of Texas. The complaint therefore relies exclusively on the second prong of § 1400(b) for its venue allegations.

The venue analysis in this case turns on whether Apple "has a regular and established place of business" in the District. The Federal Circuit has identified "three general requirements" relevant to this analysis: "(1) there must a be physical place in the district; (2) it must be a regular and established place of business; and (3) it must be the place of the defendant." *In re Cray Inc.*,

6

871 F.3d 1355, 1360 (Fed. Cir. 2017). It is the plaintiff's burden to show that these requirements are met. *In re ZTE (USA) Inc.*, 890 F.3d 1008, 1013 (Fed. Cir. 2018). And "the Supreme Court has cautioned against a broad reading of the venue statute" so as to give effect to "the clear intent of Congress in enacting the statute to restrict venue." *In re Google LLC*, 949 F.3d 1338, 1346-1347 (Fed. Cir. 2020) (collecting cases). If any of the three requirements for demonstrating a regular and established place of business of the defendant is not met, "venue is improper under § 1400(b)." *Cray*, 871 F.3d at 1360.

> **1.    Slyde Has Not Pleaded Facts Showing Any Regular And Established Place Of Business "Of The Defendant" In This District.**

Apple has no regular and established place of business in the Eastern District of Texas, and Slyde has not alleged facts sufficient to carry its burden on this issue. The statutory requirement that "'the regular and established place of business' must be 'the place of the defendant'" is dispositive. *Cray*, 871 F.3d at 1363.

Apple has not had any stores in the District for over four years. Dockendorf Decl. ¶ 14. The complaint identifies no places of business of Apple in the District and instead relies exclusively on "Best Buy locations in this District" to plead venue. Dkt. 1, ¶ 2. But as the complaint states, those are "Best Buy locations" (*id.*)—not Apple locations. It well established that "a distributor's place of business cannot establish venue for its supplier" under § 1400(b). *EMED Techs. Corp. v. Repro-Med Sys., Inc.*, No. 17-cv-728-WCB-RSP, 2018 WL 2544564, at *2 (E.D. Tex. June 4, 2018) (collecting cases). Accepting Slyde's position that third-party retailers like Best Buy may establish venue for product manufacturers "would largely overturn the decisions in *TC Heartland* and *Cray*, converting the test for venue in patent cases into one similar to the test for personal jurisdiction," *id.* at *3, which is exactly what the Federal Circuit has warned against, *see Cray*, 871 F.3d at 1361 ("Courts should … be careful not to conflate showings that may be

sufficient for other purposes, *e.g.*, personal jurisdiction or the general venue statute, with the necessary showing to establish proper venue in patent cases.").

The Federal Circuit has provided a non-exhaustive list of "considerations" for evaluating whether a location is "the place of the defendant." Those considerations include (1) "whether the defendant owns or leases the place, or exercises other attributes of possession or control over the place"; (2) "whether the defendant conditioned employment on an employee's continued residence in the district or the storing of materials at a place in the district so that they can be distributed or sold from that place"; (3) "whether the defendant lists the alleged place of business on a website, or in a telephone or other directory; or places its name on a sign associated with or on the building itself"; and (4) "the nature and activity of the alleged place of business of the defendant in the district *in comparison with* that of other places of business of the defendant in other venues." *Cray*, 871 F.3d at 1363-1364 (emphasis in original).

These considerations overwhelmingly demonstrate that Best Buy's stores are not places of business of Apple. Indeed, another court has already rejected the basis for Slyde's venue allegations—*i.e.*, that Best Buy stores that sold the defendant Samsung's products in a Samsung-branded section of the store qualified as "the place of the defendant." *See International Techs. & Sys. Corp. v. Samsung Elecs. Co.*, No. 17-cv-1748-DOC, 2018 WL 4963129, at *7 (C.D. Cal. June 22, 2018). This Court should reach the same conclusion here.

### a.   Apple does not own or lease any space in Best Buy's stores, or otherwise exercise possession or control over Best Buy's stores.

The physical space within Best Buy's stores is owned and controlled by Best Buy. Apple does not own or lease space in Best Buy's stores. Dockendorf Decl. ¶ 7. All fixtures and merchandise within those stores are Best Buy's property, and Best Buy controls the process for installing any fixtures in its stores, including the ultimate decision as to where to locate those

fixtures within its stores. *Id.* ¶¶ 8-11. As a result, Best Buy bears full responsibility for losses within its stores (*e.g.*, theft or personal injury). *Id.* ¶ 8. Because Apple has no ownership or control over Best Buy's stores, Best Buy can close its stores permanently without consulting Apple, including those with Apple Shops. *Id.* ¶ 13. Best Buy has done so dozens of times within the last three years, including one location (Lufkin) in the District. *Id.*

Apple also does not exercise control over operations at Best Buy's stores. Apple does not manage the inventory within Best Buy's stores. Leslie Decl. ¶ 3. When Best Buy orders Apple's products, Best Buy typically does not identify a particular store to receive that inventory, and Apple ships its products to one of six Best Buy distribution centers—none of which are located in the District. *Id.* Best Buy—not Apple—is then responsible for getting Apple's products from its distribution centers to Best Buy's stores. *Id.* Even when Best Buy occasionally asks Apple to ship products to a Best Buy store directly, those shipments are initiated at Best Buy's request and become Best Buy's property as soon as they leave Apple's warehouses. *Id.* ¶¶ 4-5. Best Buy provides security for its stores. Dockendorf Decl. ¶ 8. Best Buy sets the hours of operation for its stores and the prices of the Apple products that it sells. *Id.* ¶ 12; Calhoun Jemmings Decl. ¶ 9. And Apple does not complete any sales transactions or repair any products at Best Buy's stores. Calhoun Jemmings Decl. ¶¶ 9, 11.

The complaint alleges that there are "Apple-designed outlets" within Best Buy's stores called "Apple Shops." Dkt. 1, ¶ 3. But those allegations simply refer to the fact that Apple designs and provides fixtures for displaying its products within Best Buy's stores. For example, Apple has standardized Apple-branded tables and displays for its products that it provides to third-party retailers. Dockendorf Decl. ¶¶ 4-5. Those Apple-branded fixtures are not specific to Best Buy or any particular Best Buy location. *Id.* ¶ 4. Apple has requirements for where those Apple-branded

fixtures can be installed to ensure that retailers use Apple-branded fixtures in a consistent manner. *Id.* ¶ 9. But it is ultimately up to Best Buy to identify a location within its stores to install those fixtures using contractors approved by Best Buy. *Id.* Once installed, those fixtures are Best Buy's property that Best Buy controls. *Id.* ¶ 8. For example, while Apple provides routine maintenance for those fixtures (*e.g.*, to repair a damaged display case), Best Buy requires that Apple use only Best Buy-approved vendors to do that work. *Id.* ¶ 11. And in any event, such maintenance is not a basis for venue. *See Google*, 949 F.3d at 1347 ("The venue statute should be read to exclude agents' activities, such as maintenance, that are merely connected to, but do not themselves constitute, the defendant's conduct of business in the sense of production, storage, transport, and exchange of goods or services.").

The complaint also alleges that "Apple employees" called "Apple Solutions Consultants" work within Best Buy's stores in the District. Dkt. 1, ¶ 3. But the mere presence of Apple employees within the District does not satisfy the statutory requirements for venue; the venue statute focuses on control over a physical location, not who is at that location. *See Cray*, 871 F.3d at 1363 ("As the statute indicates, it must be a place *of the defendant*, not solely a place of the defendant's employee."). For example, as another case from this District recently held, the fact that a defendant's sales representatives were required to be present in third-party surgery centers and hospitals in the District and sold products at those locations as part of their jobs was not sufficient to establish venue absent evidence that the defendant exercised possession or control over those locations. *See 4WEB, Inc. v. NuVasive, Inc.*, No. 23-cv-192-JRG, 2024 WL 1932416, at \*4 (E.D. Tex. May 2, 2024) ("The Amended Complaint fails to point to any 'place' (*e.g.*, a building, a storage room, a table, or a leased shelf) in the hospitals, surgery centers, or anywhere else in this District over which NuVasive exercises possession and control.").

Venue is improper here for the same reason as in *4WEB*. The complaint contains no allegations that Apple's employees exercise possession or control over Best Buy's stores, and if anything, the actual role of these employees reinforces Apple's lack of possession or control over those stores. As an initial matter, currently only ten Apple employees work within Best Buy's stores in the District—with no more than one or two Apple employees at any particular Best Buy location. Calhoun Jemmings Decl. ¶ 5. Apple employees are not present at all times that Best Buy's stores are open; in fact, most work only Friday through Sunday. *Id.* ¶ 6. That limited and part-time presence does make Best Buy's stores a place of business of Apple. *See Fractus, S.A. v. ZTE Corp.*, No. 17-cv-561-JRG, 2018 WL 11363369, at *2 (E.D. Tex. Sept. 28, 2018) (holding that the presence of two of defendant's employees at a call center three to four days per week did not make the call center a place of the defendant). Best Buy has complete control over who can be present within its stores, and Best Buy has the right to remove Apple's employees from Best Buy's stores if Best Buy deems it necessary. Calhoun Jemmings Decl. ¶ 12.

Apple's employees also do not have any role in the operation of Best Buy's stores. While at Best Buy, Apple's employees provide information about Apple's products to prospective customers. Calhoun Jemmings Decl. ¶ 7; *see also* Dkt. 1, ¶ 3 ("Many are staffed with Apple Solutions Consultants – trained Apple employees who can help you find the best solution."). But Apple's employees are not involved in the management or operation of Best Buy's stores, and they do not exercise any control over Best Buy's employees. Calhoun Jemmings Decl. ¶¶ 4, 8. Apple's employees do not complete transactions with customers or even have access to cash registers. *Id.* ¶ 9. Apple's employees do not manage inventory, set prices for Apple's products, or have access to locked inventory or Best Buy's inventory systems. *Id.* ¶¶ 9-10. And Apple's employees do not perform product repairs. *Id.* ¶ 11. Best Buy's employees perform those functions exclusively (*id.*

¶¶ 4, 8, 9-11), consistent with the fact that Best Buy's store are places of business of Best Buy, not Apple.

This case thus presents the same issue as *4WEB* and is not at all analogous to situations where this Court has found proper venue based upon the defendant's exercise of ownership and control over a retail location.  For example, in *Tinnus Enterprises, LLC v. Telebrands Corp.*, the defendant leased space on store shelves and actively managed inventory at retail locations.  No. 17-cv-170-RWS, 2018 WL 4560742, at *5 (E.D. Tex. Mar. 9, 2018) (describing defendant's payments to secure premium shelf space); *id.* at *6 (defendant's agents moved inventory from back rooms to store shelves).  By contrast, Apple neither pays for space nor manages inventory at Best Buy's store (Dockendorf Decl. ¶ 7; Leslie Decl. ¶ 3), and the complaint does not allege otherwise.  Absent such ownership or control, the presence of Apple employees within Best Buy's stores does not make them places of business of Apple.  *4WEB*, 2024 WL 1932416, at *4.

### b.    Apple does not require its employees to live in the District or to store materials to be distributed or sold within the District.

The second consideration outlined in *Cray* (*i.e.*, "whether the defendant conditioned employment on an employee's continued residence in the district or the storing of materials at a place in the district so that they can be distributed from that place," 871 F.3d at 1363) is primarily relevant to assessing whether an employee's home constitutes a place of business of the defendant.  *See, e.g.*, *Uniloc USA, Inc. v. Nutanix, Inc.*, No. 17-cv-174-JRG, 2017 WL 11527109, at *3-4 (E.D. Tex. Dec. 6, 2017) (addressing whether employees' homes are the defendants' places of business).  Slyde has made no such allegation here.  *See* Dkt. 1, ¶¶ 2-4.  However, to the extent relevant, this factor favors finding venue improper.  Apple does not dictate that its employees live within the District.  Calhoun Jemmings Decl. ¶ 13.  Nor does Apple require its employees to store materials to be distributed or sold at Best Buy's stores within the District.  *Id.* ¶ 7.  To be sure, Apple requires

that its employees spend time at Best Buy locations within the District. *Id.* ¶ 13. But the venue statute requires a place of business of the defendant, not merely the presence of the defendant's employees. *Cray*, 871 F.3d at 1363. As discussed above (*infra* pp. 8-12), Apple does not exercise sufficient possession or control over Best Buy's stores to make those stores a place of business of Apple.

>   **c.    Apple does not hold out Best Buy's stores as places of business of Apple.**

Apple does not list Best Buy's stores as a place of business of Apple on Apple's website or on any signage associated with those stores. The complaint points to the store locator feature on Apple's website, which identifies Best Buy locations in the District where Apple products are sold. Dkt. 1, ¶ 3. But as the screenshot included in the complaint shows, Apple's website unmistakably identifies those locations as third-party retailers (*e.g.*, "Best Buy - 0202"), not as locations of Apple. *Id.* Another case from this District has squarely held that this type of website listing does not demonstrate that third-party retailer locations are places of business of the defendant. *See AptusTech LLC v. Trimfoot Co.*, No. 19-cv-133-ALM, 2020 WL 1190070, at *4 (E.D. Tex. Mar. 12, 2020) ("[Defendant] listed stores within the district on its website under a 'store locator' tab. However, the locations all have the names of the independent retailers on them. The website listings do not indicate that they are [defendant's] stores. Thus, [defendant] does not attempt to hold these stores out as its own on its website.").

As the complaint notes, Apple's website identifies that "certain Best Buy locations within this District contain Apple Shops." Dkt. 1, ¶ 3. But the "Apple Shop" label is not an indication that the location is a place of business of Apple; Apple's website explains that Apple Shops are located "within select Apple resellers and other retail stores." *Id.* In fact, the particular example cited in the complaint clearly identifies the Apple Shop as part of "Best Buy." *Id.* Best Buy's

website reinforces that Apple Shops are part of Best Buy. The excerpt of Best Buy's website reproduced in the complaint states the Apple Shop is "[n]ow open at a Best Buy near you" and describes the Apple Shop as "our [i.e., Best Buy's] store-within-a store for all things Apple." *Id.* Apple Shops plainly are not a place of business of Apple when neither Apple nor Best Buy holds out those locations as places of Apple. *See AptusTech*, 2020 WL 1190070, at *4. Third-party retailers commonly designate areas within their stores as "shops" focused on a particular manufacturer's products, and that does not make those stores a place of business of the manufacturer. *See, e.g.*, *International Techs.*, 2018 WL 4963129, at *8 ("Samsung Experience Shops" in Best Buy's stores do not make those stores a place of business of Samsung).

Finally, the complaint relies on statements from Best Buy's and Apple's websites about repairs of Apple products at Best Buy locations as an "Apple Authorized Service Provider." Dkt. 1, ¶ 4. But nothing in those materials suggests that Best Buy's stores are places of business of Apple. On the contrary, the quoted website excerpts seek to allay concerns arising from the fact that these repairs are not occurring at an Apple location. *Id.* (Best Buy's website: "Our Agents are Apple-trained, so you can trust us with all your Apple devices, no matter where you bought them."); *id.* (Best Buy's website: "Our Geek Squad® Agents are Apple-trained, so you can trust us with all your Apple devices at any Best Buy store near you."); *id.* (Apple's website: "[Y]ou get the same professionalism and quality of repair you'd expect from Apple."). Those assurances would be unnecessary if these Best Buy locations were a place of business of Apple.[2] The fact that Best Buy performs "Apple-certified" repairs using Best Buy employees who are "Apple-

---

[2] This case thus contrasts sharply with *AGIS Software Development LLC v. Google LLC*, No. 19-cv-361-JRG, 2022 WL 1511757, at *9 (E.D. Tex. May 12, 2022), where Google held out itself as "the provider of repairs" and the third party performing the repairs was "acting behind the scenes" such that customers were "not even aware" of its existence.

trained and use genuine Apple parts" (Dkt. 1, ¶ 4) is not a basis for venue. The Federal Circuit has squarely rejected that argument. *See In re Volkswagen Grp. of Am., Inc.*, 28 F.4th 1203, 1211-1212 (Fed. Cir. 2022) (rejecting argument that performing warranty and maintenance work consistent with a car distributor's quality specifications and using employees trained by the distributor made car dealerships a place of business of the distributor).

> **d.    Apple's places of business in other venues differ significantly from Best Buy's stores.**

Outside the Eastern District of Texas, Apple has its own Apple Stores that operate completely differently from the Best Buy locations on which Slyde's venue allegations rest. For example, unlike Best Buy's stores where customers can cross-shop products made by numerous different manufacturers, Apple Stores provide an experience focused solely on Apple products and related accessories. Dockendorf Decl. ¶ 15. At Apple Stores, Apple leases the storefronts, owns the merchandise, controls the inventory, provides security, and sets the hours of operation—none of which Apple does at Best Buy's stores. *Id.* Moreover, unlike at Best Buy, Apple employees at Apple Stores themselves complete sales transactions and repair Apple products. *Id.* The comparison with Apple Stores outside the District thus reveals that Best Buy's stores in the District are "not really a place of business at all" for Apple. *Cray*, 871 F.3d at 1364.

* * *

Taken together, these factors confirm that Best Buy is a third-party retailer that operates its own stores independently from Apple. Best Buy's locations in the District do not make venue proper as to Apple, and Slyde therefore has not carried its burden of establishing proper venue.

> **2.    If Not Dismissed Outright, The Court Should Transfer This Case To The Northern District Of California.**

The appropriate remedy for Slyde's failure to file this case in a proper venue is dismissal. While the Court alternatively may transfer it "in the interest of justice" to "any district or division

15

in which it could have been brought," 28 U.S.C. § 1406(a), this is not a case where Slyde made an understandable mistake in filing in the wrong venue. *See Seville v. Maersk Line, Ltd.*, 53 F.4th 890, 896 (5th Cir. 2022) ("A district court might excuse this sort of mistake where plaintiff's attorney could not have reasonably anticipated the venue problem."). Other than the fact that Slyde purportedly has its principal place of business at the same street address in Marshall, Texas as its counsel (Dkt. 1, ¶ 1),[3] this case has no connection to this District. The patented technologies were originally developed by three different Swiss companies. *See* Dkt. 1-1 through 1-11 (Comme Le Temps SA, Myotest SA, Slyde Watch SA). Slyde's sole managing member is an entity incorporated in the State of Washington. Ex. 4 at 1. Moreover, Slyde's sole basis for venue rests on an argument that contradicts settled law that "a distributor's place of business cannot establish venue for its supplier" under § 1400(b). *EMED Techs.*, 2018 WL 2544564, at \*2. The proper result in these circumstances is dismissal, not transfer. *See Seville*, 53 F.4th at 896 ("[W]here the plaintiff's attorney reasonably could have foreseen that the forum in which the suit was filed was improper, transfer is normally unwarranted." (quotation omitted)); *Westech Aerosol Corp. v. 3M Co.*, 927 F.3d 1378, 1382-1383 (Fed. Cir. 2019) (affirming dismissal for improper venue where plaintiff "disregard[ed] controlling law, here *Cray* and *ZTE*" and "failed to plead *any* facts showing [defendant] had a regular and established place of business physically located in the Western District of Washington").

But if the Court nevertheless is inclined to transfer, it should do so to the Northern District of California. Venue would be proper in the Northern District of California because Apple "resides" within that district under 28 U.S.C. § 1400(b) as a California corporation headquartered

---

[3] Slyde's certificate of formation (Ex. 1) and patent assignment agreements (Exs. 2-3) identify a different address in Houston, Texas as the company's address.

in Cupertino.  Given its proximity to witnesses and evidence from Apple, no other judicial district

bears a stronger connection to this case than the Northern District of California.  *See, e.g.*, *In re*

*Apple Inc.*, No. 21-181, 2021 WL 5291804, at \*4 (Fed. Cir. Nov. 15, 2021) (ordering case

transferred from Texas to the Northern District of California because, *inter alia*, "the Northern

District of California had a 'strong local interest in this matter'").

### B.    Counts V-XI Should Be Dismissed Because The Asserted Patents Claim Patent-Ineligible Abstract Ideas Without Any Inventive Concept.

The complaint alleges infringement of eleven patents, but the scope of this case should be

narrowed right from the start.  Specifically, Counts V-XI should be dismissed under Federal Rule

of Civil Procedure 12(b)(6) because the asserted patents are invalid under 35 U.S.C. § 101.[4]

Patent eligibility is a threshold issue that the Court may resolve as a matter of law at the

pleadings stage.  *See Semantic Search Techs.*, 425 F. Supp. 3d at 769.  "The Supreme Court has

established a two-part test for patent eligibility."  *Id.* (citing *Alice Corp. v. CLS Bank Int'l*, 573

U.S. 208, 217-218 (2014)).  Under the first step, the Court determines "whether the claims at issue

are directed to a patent-ineligible concept"—such as an abstract idea or law of nature.  *Alice*, 573

U.S. at 218.  This analysis evaluates "the 'focus' of the claims, their 'character as a whole,'" to

determine whether they are directed to an abstract idea.  *Electric Power Grp., LLC v. Alstrom S.A.*,

830 F.3d 1350, 1353 (Fed. Cir. 2016).  For claims directed to an abstract idea, the Court at step

two "must examine the elements of the claim to determine whether it contains an 'inventive

concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application."

*Alice*, 573 U.S. at 221.  A patent claim that is directed to an abstract idea and lacks an inventive

---

[4] Slyde's allegations for the four remaining patents-in-suit also lack merit, and Apple will present its defenses to those patents if this case is not dismissed in its entirety for improper venue.  This motion focuses on the seven patents from Counts V-XI because they present a similar issue under 35 U.S.C. § 101 that should be resolved in Apple's favor at the pleadings stage.

concept is invalid under § 101.  *Id.* at 217-218.

         **1.**       **The Claims Of The Asserted Patents Are Directed To An Abstract Idea.**

         **a.**       **The claims recite the abstract idea of collecting, analyzing, and displaying information.**

It is well established that collecting, analyzing, and displaying information is an abstract idea under *Alice* step one.  *Electric Power*, 830 F.3d at 1353-1354 (collecting cases).  A patent claim does not avoid being directed to an abstract idea simply by identifying "particular content" to collect, analyze, or display.  *Id.* at 1353.  Nor does a process or device become patent-eligible simply by specifying "mathematical algorithms" for analyzing particular information.  *Id.* at 1354; *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167-1168 (Fed. Cir. 2018) (analyzing data using "mathematical techniques" is an abstract idea).

Consistent with those principles, courts have repeatedly held that patents claims involving technologies similar to those at issue here are directed to an abstract idea when they recite nothing more than the steps of collecting, analyzing, and displaying information using basic mathematical calculations.  *See, e.g.*, *CardioNet, LLC v. InfoBionic, Inc.*, 816 F. App'x 471, 475 (Fed. Cir. 2020) (claims directed to abstract idea of monitoring electrical activity of a patient's heart, analyzing the data for anomalies, and displaying the results); *Philips N. Am. LLC v. Fitbit LLC*, 626 F. Supp. 3d 292, 301 (D. Mass. 2022) (claims directed to abstract idea of "collection, analysis, and presentation" of exercise-related data in a fitness device); *Fitbit Inc. v. AliphCom*, No. 16-cv-118-BLF, 2017 WL 819235, at *9 (N.D. Cal. Mar. 2, 2017) (claim directed to abstract idea of "collecting and reporting a person's cumulative amount of physical activity").  As explained below, the claims of the asserted patents in Counts V-XI are similarly directed to patent-ineligible abstract ideas.

      <u>Count V (U.S. Patent No. 9,320,457)</u>:  The '457 patent claims devices and methods "for

analyzing the biomechanical parameters of the stride of a runner." Dkt. 1-5 ("'457 patent"), 15:52-18:64.  Claim 1 is representative.[5]  It recites a device comprising "a self-sufficient electric power source," "a triaxial accelerometer," "a chronograph," "a belt," "a display," and "a digital processor."  *Id.* at 15:52-63.  Those components perform their conventional functions.  The "triaxial accelerometer" collects "at least one sequence of acceleration data in at least the vertical direction whilst the runner travels a distance on a running course," and the "chronograph" measures the distance and duration of the run.  *Id.* at 15:55-58, 15:64-66.  The "digital processor" analyzes the collected data to calculate certain "biomechanical parameters" (*e.g.*, "vertical oscillation of the center of gravity of said runner") and displays the results.  *Id.* at 15:62-16:22.

Claim 1 specifies nothing unique about the components for collecting, analyzing, or displaying this information.  Nor does it provide how the "digital processor" analyzes the input data beyond reciting the mathematical relationship between parameters dictated by the laws of physics (*e.g.*, "wherein the maximum bearing force is multiplied by the square of the contact time and divided by the runner's mass and wherein the function includes at least a constant").  '457 patent, 16:16-22.  Claim 1 is thus a classic example of a claim directed to an abstract idea.  *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 77-78 (2012) ("A patent, for example, could not simply recite a law of nature and then add the instruction 'apply the law.'"); *SAP*, 898 F.3d at 1168 ("the selection and mathematical analysis of information, followed by reporting or display of results" are "wholly abstract ideas").

Count VI (U.S. Patent No. 9,873,018): The '018 patent is a continuation of the '457 patent

---

[5] Slyde identified certain claims as representative for these patents in its complaint (Dkt. 1, ¶¶ 83, 97, 113, 124, 138, 148, 163), and this motion therefore addresses those representative claims.  *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018) ("Courts may treat a claim as representative … if the parties agree to treat a claim as representative.").  For convenience, the representative claims identified by Slyde are reproduced in an appendix to this brief.

and claims the same abstract idea.  Dkt. 1-6 ("'018 patent"), 16:16-18:28.  Claim 1 is representative, which recites "[a] device designed for analyzing biomechanical parameters of a stride of a runner" comprising "a self-sufficient electric power source," "a tri-axial accelerometer," "a GPS receiver," "a chronograph," "a digital processor," and "a wireless interface."  *Id.* at 16:16-53.  Each component performs its conventional function.  The "tri-axial accelerometer," "GPS receiver," and "chronograph" collect data, which the "digital processor" then analyzes to calculate various "biomechanical parameters."  *Id.* at 16:19-51.  The "wireless interface" does nothing more than provide for the "exchange of data with another data processing device."  *Id.* at 16:52-53.  Beyond identifying the input data (*e.g.*, "on the basis of said acceleration data, of a distance measured by said GPS receiver and/or by said accelerometer, and of a duration counted by said chronograph" (*id.* at 16:27-30)), claim 1 does not provide how the claimed parameters are calculated.  This generic collecting and analyzing information plainly constitutes an abstract idea under *Alice* step one.  *Electric Power*, 830 F.3d at 1353-1354.

Count VII (U.S. Patent No. 9,536,134):  The '134 patent claims devices and methods for measuring "athletic performance."  Dkt. 1-7 ("'134 patent"), 11:30-14-16.  Claim 1 is representative.  It recites "[a]n athletic performance monitoring device" comprising "an accelerometer" and "a user-worn device with a processing system."  *Id.* at 11:30-44.  The accelerometer is "adapted to be worn by an athlete close to the center of gravity of the athlete" and collects "acceleration data" that it "can wirelessly communicate" to the processing system.  *Id.* at 11:31-32, 11:36-39.  The "processing system … requests acceleration data from the accelerometer only when a predefined event has occurred" and "can process the acceleration data it receives from the accelerometer to provide athletic performance information."  *Id.* at 11:39-44.  Claim 1 does not specify how the claimed device functions beyond reciting the generic steps of collecting and

analyzing information, which renders the claim wholly abstract. *Electric Power*, 830 F.3d at 1353-1354. The fact that the accelerometer is worn "close to the center of gravity of the athlete" ('134 patent, 11:31-32) does not change the fundamentally abstract nature of the claims. At most, that limitation specifies the environment in which the abstract idea is performed, but it "do[es] not render an otherwise abstract concept any less abstract." *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017).

<u>Count VIII (U.S. Patent No. 11,687,809)</u>: The '809 patent claims methods and devices for estimating an athlete's race time. Dkt. 1-8 ("'809 patent"), 10:2-12:39. Claim 20 is representative. It recites "a wearable device" that includes "an inertial sensor and/or positional sensor for measuring a plurality of intermediate times during a race." *Id.* at 12:1-13. The wearable device also includes "a processing unit arranged for retrieving, based on said intermediate time and on previous races of other athletes, a race profile as a non-linear function of time over distance (t=f(d))" and "a memory for storing a plurality of predefined race profiles." *Id.* at 12:14-20. The wearable device uses the "race profile" to determine "at least one of" (1) "a race time prediction"; (2) "a probability of achieving a target time at the end of the race"; and/or (3) "an indication whether the pace followed by the athlete is too fast, adequate or too slow in order to achieve the target time." *Id.* at 12:2-9. Claim 20 further requires the wearable device to have "a plurality of predefined race profiles," including "a first starter race profile" that has "a more rapid pace during an initial section than during a last section of the race" and "a second starter race profile" that has "a more rapid pace during a last section than during an initial section of the race." *Id.* at 12:25-31.

Claim 20 is directed to an abstract idea of using the athlete's pace to estimate a race finish time. This is exactly what athletes and their coaches have long done in their minds—*e.g.*, runners using wristwatches to measure their pace (*e.g.*, 7 minutes per mile) and estimate the time in which

they will finish the race (*e.g.*, 35 minutes for 5 miles). Indeed, the '809 patent itself concedes that this is a process that runners have long done in their minds. '809 patent, 1:22-24 ("For example, most marathoners predict a time performance and adjust their pace during the race in order to achieve this target."). The use of a "race profile" is not unique to the claimed invention; all athletes who measure their performance against a target pace follow the same process. At most, claim 20 simply automates in a wearable device steps that "'can be performed in the human mind' or 'using a pencil and paper,'" which is "a telltale sign of abstraction." *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1316 (Fed. Cir. 2021); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016) (claims abstract where "there is nothing in the claims themselves that forecloses them from being performed by a human mentally or with pen and paper").

Count IX (U.S. Patent No. 11,875,696): The '696 patent claims methods and devices "for determining biomechanical parameters of the stride of a runner." Dkt. 1-9 ("'696 patent"), 6:49-8:48. Claim 17 is representative. It recites "[a]n accelerometer device for determining biomechanical parameters of the stride of a runner with a high accuracy," which comprises (1) "means for fastening the device to one wrist, to one upper arm, to the head, or to one shoe"; (2) "an accelerometer for measuring an initial sequence of acceleration data in at least the vertical direction, said initial sequence of acceleration data depending on the motion of the runner's center of mass, and on extra-motions of the accelerometer device relative to the runner's center of mass"; and (3) "a processing system containing a processor and a memory." *Id.* at 8:17-29. The "memory" contains "program code" for analyzing the acceleration data to identify "at least one frequency component caused by the relative motion of the accelerometer device relative to the runner center of mass" and processing that data to attenuate that identified frequency component. *Id.* at 8:30-39. The program code further analyzes the resulting "modified sequence of acceleration

data" to determine "said biomechanical parameters of the stride." *Id.* at 8:40-42.

Claim 17 is entirely abstract. The accelerometer simply performs its usual function of collecting acceleration data that reflects the motion of the portion of the body to which it is attached. '696 patent, 8:22-27. The "processing system" contains generic computer components (*e.g.*, "a processor," "memory," and "program code") that perform their usual function of analyzing data. The steps of "identifying a frequency component" and then "attenuating" it are simply the well-known process of recognizing and filtering data, which courts have consistently recognized is abstract. *International Bus. Machs. Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1378 (Fed. Cir. 2022) (filtering data to present "a more limited data set to the user" is an abstract idea); *CardioNet LLC v. InfoBionic, Inc.*, Nos. 20-2123, -2150, 2021 WL 5024388, at *3-4 (Fed. Cir. Oct. 29, 2021) (claims reciting filtering a patient's heartbeat signals directed to an abstract idea); *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (claims reciting "data collection, recognition, and storage" are abstract). Moreover, claim 17 does not specify how to identify the claimed frequency component or to attenuate it, which reinforces its abstract nature. *Electric Power*, 830 F.3d at 1354. At bottom, claim 20 thus recites the abstract idea of collecting and analyzing data without specifying "any particular assertedly inventive technology for performing those functions." *Id.*

Count X (U.S. Patent No. 11,833,391): The '391 patent is a continuation of the '018 patent. The '391 patent claims methods and devices "for analyzing biomechanical parameters of a runner's stride using an electrically autonomous device." Dkt. 1-11 ("'391 patent"), 16:48-22:16. Claim 1 is representative and recites a method of using a device comprising generic computer components—*i.e.*, "a self sufficient electric power source," "a triaxial accelerometer," "a chronograph," "a GPS receiver," and "a digital processor." *Id.* at 16:51-58. The "triaxial

accelerometer" collects "at least one sequence of acceleration data in at least the vertical direction whilst the runner travels a distance on a running course," which the "digital processor" uses along with data on the distance travelled by the runner collected by the accelerometer or GPS receiver to calculate a "stiffness" parameter. *Id.* 16:60-17:12. The claim identifies certain input metrics for the calculation (*e.g.*, "a maximum bearing force") and the mathematical relationship between various biomechanical parameters (*e.g.*, "reactivity being computed as the ratio between the flight time and contact time" of the runner's foot during a stride), but does not identify any unique features of the processing device necessary to perform the claimed analysis. Claim 1 is thus directed to the "wholly abstract ideas" of collecting data and the "mathematical analysis of information." *SAP*, 898 F.3d at 1168.

Count XI (U.S. Patent No. 10,881,905): The '905 patent claims methods and devices "for detecting asymmetries in a movement of a user." Dkt. 1-11 ("'905 patent"), 21:60-24:55. Claim 1 is representative. It recites a method that involves "fastening a device to the torso of said user, close to his/her center of gravity." *Id.* at 21:62-63. The device comprises "a triaxial accelerometer" and "a digital processor." *Id.* at 21:64-67. The "triaxial accelerometer" collects "distinct acceleration data along three distinct axes," which the "digital processor" analyzes to calculate "a plurality of biomechanical parameters." *Id.* at 21:64-22:2. The calculated "biomechanical parameters" include "a stride regularity index" and a "fatigue level indicator," which are calculated according to mathematical relationships described in the claim. *Id.* at 22:4-12. Claim 1 further recites that the calculated "plurality of biomechanical parameters … allow at least one asymmetry in the movements of the user to be determined." *Id.* at 22:16-20.

The collection and analysis of data recited in claim 1 is entirely abstract. The claim simply recites collecting "acceleration data" using a conventional "triaxial accelerometer"—*i.e.*, one that

provides "distinct acceleration sequence data along three distinct axes"—and then analyzing that data using basic mathematical calculations. *Electric Power*, 830 F.3d at 1353-1354. The fact that the device is fastened on the user's torso does not change the abstract nature of the claim. The abstract idea of collecting and analyzing data is not any less abstract when that data is collected from a particular location. *Capital One*, 850 F.3d at 1340.

> **b.    The asserted patents claim no improvement in computer technology.**

The complaint identifies no alleged technological improvement provided by the asserted patents or unique technological problem that they supposedly solve. The complaint's only discussion of the technology underlying these patents simply reinforces their abstract nature by pointing to generic computer components (*e.g.*, "a power source, accelerometer, chronograph, and digital processer") that perform abstract functions (*e.g.*, "analyzing the biomechanical parameters of the stride of a runner"). Dkt. 1, ¶¶ 25-30. Having failed to plead any facts supporting a purported technological improvement, Slyde may not avoid dismissal on the basis of any alleged factual disputes on this issue. *Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x 529, 538 (Fed. Cir. 2020) (complaint that "merely provides a conclusory allegation" of an improvement is "insufficient to survive a motion to dismiss").

In any event, there is no plausible basis for Slyde to identify an alleged improvement to computer technology that would render the claims not abstract at *Alice* step one. As discussed above, the claims simply recite well-known computer components that perform their conventional functions in a conventional sequence—*e.g.*, an "accelerometer" for providing "acceleration data" or a "digital processor programmed for calculating." *Supra* pp. 18-25. Indeed, Slyde's own patent specifications highlight the lack of improvement to the functioning of the computer itself by emphasizing the conventional nature of the claimed computer technology. *See, e.g.*, '134 patent,

7:51-53 ("The technical features required in the processing system 5 to enable it to monitor these parameters are well known in the art.").  Moreover, there is no unique technological problem purportedly solved by these patents.  On the contrary, the patents address issues that are not unique to any technological environment—such as estimating a runner's race time.  *Supra* pp. 18-25. Slyde's patent claims do not recite any "specific improvement … in how computers could carry out one of their basic function," but instead simply recite patent-ineligible "abstract ideas that use computers at tools."  *Electric Power*, 830 F.3d at 1354.

### 2. There Is No Inventive Concept That Transforms The Claimed Abstract Idea Into A Patent Eligible Application.

*Alice* step two is a "search for an 'inventive concept'—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself."  *Alice*, 573 U.S. at 217-218.  This analysis focuses on the claim language by "looking more precisely at what the claim elements add."  *Electric Power*, 830 F.3d at 1353.  *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017) ("To save a patent at step two, an inventive concept must be evident in the claims.").

Slyde's patent claims lack any inventive concept because they merely use generic computer components to perform their conventional functions.  *See Symantec*, 838 F.3d at 1315 (claims "'in which each step does no more than require a generic computer to perform generic computer functions' do not make an abstract idea patent-eligible" under *Alice* step two) (quoting *Alice*, 573 U.S. at 225)).  The claims do not recite "new source or type of information, or new techniques for analyzing it."  *Electric Power*, 830 F.3d at 1355.  On the contrary, the claims use "result-focused functional language, containing no specificity about how the purported invention achieves those results," which fails to provide any inventive concept.  *Beteiro, LLC v. DraftKings Inc.*, 104 F.4th 1350, 1356 (Fed. Cir. 2024) ("Claims of this nature are almost always found to be ineligible for

patenting under Section 101.").  Indeed, to the extent that Slyde's patent claims say anything at all about how the alleged invention functions, they simply recite basic mathematical calculations that are themselves an abstract idea that do provide any inventive concept.  *Mayo*, 566 U.S. at 84 ("[S]imply implementing a mathematical principle on a physical machine, namely a computer, [i]s not a patentable application of that principle.")

Counts V, VI, X, and XI ('457, '018, '391, and '905 patents):    There is no inventive concept claimed in the '457, '018, '391, and '905 patents.[6]  The claims of these patents utilize the same set of well-known computer components performing their traditional functions—*e.g.*, "a self-sufficient electric power source," "a triaxial accelerometer capable of supplying at least one sequence of acceleration data in at least the vertical direction whilst the runner travels a distance on a running course," "a chronograph" for measuring "duration," "a display" for "displaying," "a digital processor programmed for calculating," and "a GPS receiver" for measuring "distance." '457 patent, 15:51-16:22; '018 patent, 16:15-53; '391 patent, 16:48-17:12; '905 patent, 21:60-22:20.  The functions performed by these components are claimed in a purely results-oriented manner (*e.g.*, "supplying at least one sequence of acceleration data," "calculating … biomechanical parameters").  The claims recite particular biomechanical parameters to be calculated (*e.g.*, "the vertical oscillation of the center of gravity of said runner"), but merely limiting the claims "to a particular field of information … does not move the claims out of the realm of abstract ideas."  *SAP*, 898 F.3d at 1169.  The claims provide no new way for collecting or analyzing that information, such as with an inventive algorithm or software process.  On the

---

[6] These patents claim priority to the same Swiss patent application, and the '457, '018, and '391 patents share a common specification.  The '905 patent includes material that overlaps with the specification of the '457, '018, and '391 patents, and the claims of all four patents include similar elements arranged in the same manner that can be analyzed together at *Alice* step two.

contrary, to the extent that the claims specify anything about how this information is analyzed, they recite mathematical calculations (*e.g.*, "wherein the maximum bearing force is multiplied by the square of the contact time and divided by the runner's mass" ('457 patent, 16:19-21)) that provide no inventive concept. *SAP*, 898 F.3d at 1170.

To the extent that these claims are limited to attaching a device in a particular location (*e.g.*, "fastening a device on the torso of said user" ('905 patent, 21:62)), that is insufficient to supply an inventive concept. Indeed, the description of the prior art contained in all four of these patents confirms that the placement of such devices as claimed was well-known and conventional. *See, e.g.*, '905 patent, 2:65-67 ("US20090018794 describes a device for measuring the progress of a moving person by means of an inertial sensor placed close to the center of gravity."); *id.* at 4:25-27 ("WO2006030065 describes a device for detecting the movement of a human being by a movement sensor carried on the torso, on the shoes or on the wrist of a human being.").[7] These patents also claim no new way of attaching the device and instead rely on conventional components such as "a belt." *See, e.g.*, '457 patent, 15:60. At most, the placement of the device simply specifies a particular environment for performing the claimed abstract idea; it "do[es] not render an otherwise abstract concept any less abstract." *Capital One*, 850 F.3d at 1340.

Count VII ('134 patent): The '134 patent claims no inventive concept either. The claimed components are well-known and used in their conventional way—*e.g.*, "an accelerometer" that collects "acceleration data" and "a processing system" that "can process." '134 patent, 11:30-44. The '134 patent concedes that "[t]he technical features required in the processing system … are well known in the art," *id.* at 7:51-53, which reinforces the lack of any inventive concept. *See*

---

[7] The '457, '018, and '391 patents contain an identical description of the prior art. *See* '457 patent, 2:66-3:1, 4:22-24; '018 patent, 3:4-6, 4:32-34; '391 patent, 3:9-11, 4:35-37.

*Weisner v. Google LLC*, 51 F.4th 1073, 1083-1084 (Fed. Cir. 2022) ("[T]he specification describes the components and features listed in the claims generically, supporting the conclusion that these components and features are conventional, not inventive concepts in the patents."). And the functions of those components fail to capture an inventive algorithm and instead are claimed in purely results-oriented terms—*e.g.*, the "processing system … can process the acceleration data it receives from the accelerometer to provide athletic information" ('134 patent, 11:36-44)—which supply no inventive concept. *Electric Power*, 838 F.3d at 1356. The "accelerometer" is "adapted to be worn by an athlete close to the center of gravity of the athlete." '134 patent, 11:31-32. But as discussed above (p. 21), the placement of the device does not confer an inventive concept. At most, the placement of the device specifies a particular environment for practicing the claimed abstract idea. *Capital One*, 850 F.3d at 1340.

Count VIII ('809 patent): The claims of the '809 patent also lack any inventive concept. The claim recites only well-known computer components performing their conventional functions—*e.g.*, "an inertial sensor and/or a positional sensor for measuring," "a processing unit arranged for retrieving … and for determining," and "a memory for storing." '809 patent, 12:1-31. And the process performed by the claimed device is entirely routine and conventional—*i.e.*, estimating an athlete's race times using intermediate pacing data. The '809 patent itself concedes that this process is something that people do themselves in their minds. *Id.* at 1:22-24 ("For example, most marathoners predict a time performance and adjust their pace during the race in order to achieve this target."). Merely automating this entirely intuitive process in a "wearable device"—as the claims of the '809 patent purport to do—fails to provide any inventive concept. *Alice*, 573 U.S. at 223 ("[s]tating an abstract idea while adding the words 'apply it with a computer'" does not confer patent eligibility).

Count IX ('696 patent):  There is no inventive concept claimed in the '696 patent.  The claims utilize well-known computer components that perform their usual functions—*e.g.*, "an accelerometer for measuring an initial sequence of acceleration data in at least the vertical direction" and "a processing system containing a processor and a memory containing programming code."  '696 patent, 8:17-41.  The claims fail to recite an inventive algorithm or software process and instead describe the operation of the claimed device in purely result-oriented terms—*e.g.*, "identifying in said initial sequence of acceleration data at least one frequency component," "attenuating said frequency component," and "determining said biomechanical parameters (*id.* at 8:30-41)—without specifying how those functions are performed.  *See Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017) ("The claim requires the functional results of 'converting,' 'routing,' 'controlling,' 'monitoring,' and 'accumulating records,' but does not sufficiently describe how to achieve these results in a non-abstract way.").  While the claims specify that the accelerometer is fastened "to one wrist, to one upper arm, to the head, or to one shoe" ('696 patent, 8:20-21), the patent acknowledges that the placement of an accelerometer in those locations was already known in the art and thus supplies no inventive concept.  *Id.* at 1:41-42 ("Wristwatches are also known that are provided with an inertial sensor."); *id.* at 1:61-62 ("Different companies also suggest placing an accelerometer in or on the shoe.").  At most, the placement of the device in the locations recited in the claims limits the alleged invention to a particular environment, but does not alter its fundamentally abstract nature.  *Capital One*, 850 F.3d at 1340.

## VI.    CONCLUSION

The Court should dismiss this case for improper venue or, alternatively, transfer it to the Northern District of California.  If not dismissed for improper venue, the Court should dismiss Counts V-XI for failure to state a claim because those patents are invalid under 35 U.S.C. § 101.

Dated: July 15, 2024

Respectfully submitted,

/s/ *Melissa R. Smith*

Joseph J. Mueller (*pro hac vice*)
Andrew J. Danford (*pro hac vice*)
Sarah R. Frazier (*pro hac vice*)
Marissa A. Lalli (*pro hac vice*)
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000
joseph.mueller@wilmerhale.com
andrew.danford@wilmerhale.com
sarah.frazier@wilmerhale.com
marissa.lalli@wilmerhale.com

Mary V. Sooter (*pro hac vice*)
WILMER CUTLER PICKERING HALE
AND DORR LLP
1225 17th Street
Suite 2600
Denver, CO  80202
(720) 274-3135
mindy.sooter@wilmerhale.com

Mark D. Selwyn (*pro hac vice*)
WILMER CUTLER PICKERING HALE
AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, CA  94306
(650) 858-6000
mark.selwyn@wilmerhale.com

Melissa R. Smith
Texas State Bar No. 24001351
GILLAM & SMITH LLP
303 S. Washington Ave.
Marshall, TX 75670
(903) 934-8450
melissa@gillamsmithlaw.com

*Attorneys for Defendant Apple Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on July 15, 2024.

*/s/ Melissa R. Smith*
Melissa R. Smith

**CERTIFICATE OF CONFERENCE**

Pursuant to Local Rule CV-7(h), counsel for Defendant met and conferred with counsel for Plaintiff, and counsel for Plaintiff indicated that Plaintiff is opposed to the relief sought by this Motion.

*/s/ Melissa R. Smith*
Melissa R. Smith